# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CFA INSTITUTE, a Virginia Non-Stock Corporation, | CASE NO. 3:19-cv-00012 |
| *Plaintiff*, | **MEMORANDUM OPINION** |
| v. | |
| AMERICAN SOCIETY OF PENSION PROFESSIONALS & ACTUARIES, *et al.*, | JUDGE NORMAN K. MOON |
| *Defendants.* | |

This matter is before the Court on Defendant American Society of Pension Professionals & Actuaries' ("ASPPA")'s Motion for Summary Judgment. Dkt. 93. Plaintiff CFA Institute brought suit against Defendants alleging trademark infringement and unfair competition under state and federal law. Plaintiff alleges that Defendants' Certified Pension Fiduciary Adviser program, operating under the acronym "CPFA," infringes on Plaintiff's marks relating to its own "Chartered Financial Analyst" program, operating under the acronym "CFA." Defendants now move for summary judgment on all four counts of Plaintiff's complaint, contending that no jury could find a likelihood of confusion between Plaintiff's and Defendants' respective marks.

The Court will grant Defendants' motion. Considering the relevant factors identified by the Fourth Circuit—chief among them being proof of actual confusion in the marketplace—Plaintiff fails to offer evidence from which a jury could find that a likelihood of confusion exists between its CFA Marks and Defendants' Mark. As a result, the Court need not address Defendants' arguments as to Plaintiff's damages.

1

## I. Factual Background

The parties to this dispute are organizations in the business of certifying, training, and providing a network for financial advisors. Dkt. 1, ¶ 10; Dkt. 35 at 12. Plaintiff, the CFA Institute, is a non-stock corporation based in Charlottesville, Virginia, and caters to financial advisors generally, rather than industry-specific advisors as do Defendants. *Id*. Plaintiff claims a worldwide membership of 147,000. Dkt. 1, ¶ 10. In addition to services offered to its members, such as networking events and seminars, it also provides a training and certification program: the "Chartered Financial Analyst" program, or the "CFA Program." Dkt. 1, ¶ 27. Plaintiff federally trademarked "CFA" on June 6, 1972, for "association services—namely, the promotion of interest and professional standards in the field of financial analysts." Dkt. 1, ¶ 15. The USPTO deemed this registration incontestable in 1977. *Id*. It has since received incontestable trademark registrations for CFA for "educational services," printed financial publications, and "financial analysis services" (referred to collectively herein as "CFA Marks"). Dkt. 1 at 3–8.

To earn Plaintiff's CFA certification, investment professionals must have at least four years of relevant experience and complete a self-study course followed by three six-hour examinations. Dkt. 1, ¶¶ 27–28. Plaintiff claims the CFA Program is comparable to a post-graduate degree in "scope and depth." *Id*. Those who pass the examination become a CFA Institute member and may use the professional designation "Chartered Financial Analyst" or "CFA." Dkt. 1, ¶ 29. CFAs are then bound by the CFA Institute's codes of ethics and professional conduct, and they must pay annual dues to Plaintiff to maintain their certification. *Id*. Plaintiff claims "investors and financial professionals recognize the CFA Marks as the definitive standard for measuring competence and integrity in the fields of portfolio management and investment analysis." Dkt. 1, ¶ 28.

The named Defendants are three of five subsidiary organizations under the umbrella of the American Retirement Association ("ARA"). Dkt. 35 at 12. The ARA trains, educates, and offers membership services for those providing financial advice to employers on retirement plans offered to their employees. *Id*. The ARA claims a worldwide membership of 14,000. *Id*.

One of the ARA's subsidiaries named in the Complaint is the National Association of Plan Advisors ("NAPA"), which offered a "Plan Financial Consulting" or "Qualified Plan Financial Consultant" certification until 2016, when it was replaced by the "Certified Plan Fiduciary Advisor" or "CPFA" certification. Dkt. 35 at 6, 12. Defendants allege that this new certification corresponded with the U.S. Department of Labor broadening the definition of a "fiduciary" in 2016, pursuant to the Employee Retirement Income Security Act of 1974.[1] Dkt. 35 at 12. The CPFA credential can be earned by candidates who pass a three-hour multiple-choice test. CPFAs must complete continuing education to maintain the credential. Dkt. 35 at 5.

Before Plaintiff filed this lawsuit, Defendant ASPPA sought to register its CPFA mark with the U.S. Patent and Trade Office (U.S. Application No. 87103390). Dkt. 16 at 1. This mark was published in the Federal Register on August 15, 2017. *See* Notice of Publication, United States Patent and Trademark Office, Serial No. 87-103,390 (July 26, 2017). Plaintiff subsequently filed a Notice of Opposition against ASPPA with the Trademark Trial and Appeal Board ("TTAB"), alleging that Plaintiffs' CFA Marks were or would be damaged by the registration of the CPFA

---

[1] *See* Department of Labor, Employee Benefits Security Administration, "Definition of the Term ''Fiduciary''; Conflict of Interest Rule—Retirement Investment Advice; Best Interest Contract Exemption; ... Final rule," 81 Fed. Reg. 20946, 21001–02 (April 8, 2016); *see also* Annette L. Nazareth, *Department of Labor's Final Rule on "Fiduciary" Definition*, Harvard Law School Forum on Corporate Governance and Financial Regulation (April 21, 2016), available at https://corpgov.law.harvard.edu/2016/04/21/department-of-labors-final-rule-on-fiduciary-definition/.

Mark. Dkt. 16, Ex. 2. ASPPA then filed a counterclaim—nearly identical to the counterclaim presently at issue—to restrict the registration of the CFA Marks to reflect that Plaintiff does not direct its goods and services specifically to professionals in the field of retirement financial planning at the employer level. *See* ASPPA Answer & Countercl., *CFA Inst. v. Am. Soc'y of Pension Prof'ls & Actuaries*, Opp'n No. 91239462 (T.T.A.B. 2018), Filing No. 5. ASPPA also alleged as an affirmative defense that there was no likelihood of confusion, because the two marks catered to distinct segments of financial planning. *Id.*

While the TTAB proceedings progressed, Plaintiff filed an action in this Court, bringing the following claims: Federal Trademark Infringement pursuant to 15 U.S.C. § 1114; Federal Unfair Competition, False Designation of Origin, and False and Misleading Representations pursuant to 15 U.S.C. § 1125(a); Trademark Infringement and Unfair Competition under Va. Code §§ 59.1-92.12, 59.1-92.13; and Trademark Infringement and Unfair Competition under Virginia Common Law; and Accounting under 15 U.S.C. § 1117. Dkt. 1. Shortly after, Plaintiff moved the TTAB to stay its proceedings pending this Court's disposition of the matter, which the TTAB granted. TTAB Order of Apr. 26, 2019, Opp'n No. 91239462, Filing No. 21. ASPPA filed a similar motion to stay this action, which U.S. Magistrate Judge Joel C. Hoppe denied. Dkt. 31.

In this action, Plaintiff claims that Defendants' CPFA mark violates Plaintiff's CFA Marks in numerous ways. Plaintiff alleges that "[c]onsumers are likely to believe mistakenly that Defendants are affiliated or connected with, or otherwise authorized or sponsored by CFA Institute." Dkt. 1, ¶ 49. In addition, Plaintiff alleges that the CPFA mark is "nearly identical to and confusingly similar to CFA Institute's CFA Marks in appearance, sound, meaning, and commercial impression." Dkt. 1, ¶ 50. Finally, Plaintiff alleges that both the CFA Marks and Defendants'

4

CPFA mark are "used in connection with goods and services used by professionals in the field of retirement financial planning." Dkt. 1, ¶ 51.

In their Answer to Plaintiff's Complaint, Defendants do not deny that they use the CPFA mark, that they publish this mark on their website and marketing materials, and that it is geared toward financial advisors targeting employer-level retirement planning. Dkt. 35, ¶¶ 8–10. However, Defendants allege that there is no likelihood of confusion because the markets Plaintiff and Defendants target are entirely distinct. *Id*. Specifically, Defendants claim that while Plaintiff advises on individual-level retirement planning, among other financial advising, Defendants advise on the employer level. *Id*. To this end, Defendants assert an Affirmative Defense that even if the Court finds that a likelihood of confusion exists, any such risk of confusion may be avoided by amending Defendants' CPFA mark to restrict it, pursuant to 15 U.S.C. § 1068, to services exclusively related to "retirement plan advisors who provide fiduciary advice to employers at the plan level." Dkt. 35, ¶ 105.

Defendants filed a motion for summary judgment and Plaintiff filed an opposition brief on June 24, 2020. Dkt. 93, 113. Defendants replied to the opposition brief and this Court heard arguments on the motion on July 17, 2020. Dkt. 123, 131. Having argued the motion, it is now fully briefed and ripe for review.

## II.     Legal Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the Court must take "the evidence and all

5

reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

### III. Analysis

To prevail on a trademark infringement claim, "a plaintiff must prove that it owns a valid and protectable mark, and that the defendant's use of a 'reproduction counterfeit, copy, or colorable imitation' of that mark creates a likelihood of confusion." *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (citing 15 U.S.C. § 1115(1)(a)). The parties don't dispute that Plaintiff owns valid, protectable marks in its "CFA" certification. The dispositive question for this claim, then, is whether Defendants' use of their CPFA trademarks (the CPFA credential and its NAPA CPFA Logo) creates a likelihood of confusion. Counts Two through Four of Plaintiff's complaint—unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) and trademark infringement and unfair competition under Virginia Law—require the same proof in this case. *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 n.5 (4th Cir. 2002) ("The test for trademark infringement and unfair competition under the Lanham Act is essentially the same[.]"); *Swatch AG v. Beehive Wholesale, Ltd. Liab. Co.*, 739 F.3d 150, 162 (4th

6

Cir. 2014) (Virginia law "requires the same proof, including a likelihood of confusion, as the Lanham Act offense[]."); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 n.10 (4th Cir. 1995) ("The test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion as to the source of the goods or services involved.").

"A likelihood of confusion exists if 'the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" *George & Co.*, 575 F.3d at 393 (quoting *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006)). Courts look at "how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *CareFirst of Md.*, 434 F.3d at 267.

To guide the likelihood-of-confusion analysis, the Fourth Circuit has articulated nine factors for courts to consider: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990). However, the Fourth Circuit has characterized these factors as "only a guide—catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion." *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992). Not all

nine factors are "of equal importance, nor are they always relevant in any given case." *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 661 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017).

Plaintiff outlines three possible populations that could be confused by Defendants' use of their CPFA Mark: 1) the people who may seek CFA or CPFA credentialing, 2) the people who employ these people once they obtain the CFA or CPFA credential, and 3) the clients that may hire these companies. With respect to this third category, Plaintiff argues that even if the subject matter underlying the CPFA credential is completely distinct from the subject matter underlying the CFA, CPFA holders nevertheless hold themselves out as general financial advisors of the kind CFA certifies. Because of this, Plaintiff argues, laypeople may fail to distinguish between CFA holders and CPFA holders working as financial advisors. In light of the fact that the credential is much more difficult and time consuming to obtain, Plaintiff contends that this risk of confusion threatens to dilute the value of CFA's credential by confusion with a "cheap knockoff."

### A. Strength of Plaintiff's Marks

The Court begins its analysis of likelihood of confusion by considering the strength of Plaintiff's CFA Marks in the marketplace. The conceptual and commercial strength of the CFA Marks are both relevant. Conceptually and commercially, Plaintiff's CFA Marks are not as weak as Defendants contend. However, notwithstanding the fact that the CFA Marks enjoy robust trademark protection, they lack the distinctiveness that would heighten the likelihood of confusion with a superficially similar acronym.

<u>Conceptual strength</u>

A mark's conceptual strength is determined in part by its placement into one of the four categories of distinctiveness: generic, descriptive, suggestive, or arbitrary/fanciful. *George & Co.*, 575 F.3d at 393–94. Typically, generic marks are the only category not considered distinctive in

8

some way because they do not "signf[y] the source of goods nor distinguish[] the particular product from other products on the market." *Id.* at 394 (citing *Retail Servs., Inc. v. Freebies Publishing*, 364 F.3d 535, 538 (4th Cir. 2004)). Generic marks are never entitled to trademark protection. *Id.* In this context the Court is left to determine whether the conceptual strength of the marks fall in the generic category, or prove to be distinctive and under the umbrella of a descriptive, suggestive, or arbitrary/fanciful mark.

Also relevant here is the frequency with which a term is used by third parties. *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997). Evidence of third-party marks can weaken a claim contending that the mark at issue is uniquely distinctive and commercially strong. This is because prevalent use of the mark, or a component of it, demonstrates that it is not truly distinctive. If it were distinctive, it would not be used independently by so many other businesses in that industry. *See Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 448 (E.D. Va. 2019).

Further, even if the third-party marks are not commercially significant, "it is well-established that, even without evidence of commercial impact, the widespread use of similar marks by third parties is 'powerful on its face' to weaken the inherent distinctiveness of the plaintiff's mark." *Id.* at 449 (citing *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015)). Essentially, the extensive use of similar marks by third-parties signals that the mark in question may lack distinguishing features within an industry when those marks or terms are used in ordinary parlance.

Defendants argue that Plaintiff's mark is conceptually weak because 1) it's a generic acronym and 2) it is very similar to numerous acronyms used in financial services. Defendants state that "[t]here are at least 100 third-party credentials in the financial services field with some

9

combination of 'C,' 'F,' and/or 'A.'" Dkt. 94 at 36. To this end, "CFA Institute has acquiesced—either through years-long (in some cases decades) coexistence without confusion or objection, or formalized agreements—to over a dozen third- party uses and/or registrations of acronyms for financial services designations that contain some combination of "C," "F", and/or "A."" *Id.* at 36–37. Some of these include: CFAA, CFA, and CFF. *Id.*

On the other hand, Plaintiff argues that the USPTO protection of its CFA Marks conclusively demonstrates the conceptual strength of its marks. "CFA Institute owns at least nine U.S. trademark registrations for the CFA Marks, with a date of first use at least as early as 1962. Dkt. 113 at 28. Five of its U.S. Trademark Registrations are valid and incontestable under the Lanham Act, "and are therefore conclusive evidence of the validity of the registered marks and of the registration of the marks, of the ownership of the marks by CFA Institute, and of the exclusive right to use the registered marks in commerce by CFA Institute under Section 33 of the Lanham Act, 15 U.S.C. § 1115." *Id.* As a result, Plaintiff argues, its "registrations confer exclusive use of the CFA Marks throughout the United States in connection with the CFA Institute Goods & Services, and there can be no question at this point that the CFA Marks possess conceptual strength." *Id.*

This factor does not weigh strongly for either party. "Normally, the PTO's registering of a trademark is prima facie evidence of that mark's conceptual strength because the PTO registers only fanciful, arbitrary or suggestive marks, or descriptive marks shown to have acquired secondary meaning." *Valador*, 241 F. Supp. 3d at 662. But regardless of how robustly the CFA mark is trademarked, it is quite generic. *See George & Co.*, 575 F.3d at 395 n.12 (the "Fourth Circuit has also expressed doubt whether an abbreviation that merely describes the underlying product can be anything more than descriptive."); 2 Thomas McCarthy, *McCarthy On Trademarks*

10

*and Unfair Competition* § 11:32 (collecting cases) ("An abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will still be held to be descriptive."); *see also id.* § 7:11 ("If a series of letters is merely a recognizable abbreviation for a descriptive or generic term, the abbreviation is also classified as descriptive or generic.). *But see G. Heileman Brewing Co. v. Anheuser–Busch, Inc.*, 873 F.2d 985, 994–99 (7th Cir.1989) (finding that an abbreviation or nickname of a descriptive term may be protectable upon the showing of secondary meaning and holding that "L.A." was a descriptive abbreviation for the descriptive words "low alcohol" for beer and no secondary meaning was acquired). More importantly, "the conceptual strength of a commonly-used mark decreases as the number of third-party registrations increases." *Id.*

In this sense, Defendants' considerable evidence of similar third-party registrations counters Plaintiff's prima facie evidence supplied by the PTO registrations of the CFA Marks. It is notable, however, that just because third-party registrations exist does not necessarily mean that those abbreviations are unquestionably similar. For example, CFA sounds and looks distinct from CPWA. By contrast, comparing the CFA Marks with CFP (Certified Financial Planner) or CFA (Capitol Financial Advisors) demonstrates the sound and look of the abbreviation is much less distinctive. Therefore, the Court notes its caution as to the weight it attributes under this factor as many of the third-party registered marks are not as similar as they appear from a quick glance.

<u>Commercial strength</u>

The commercial strength inquiry in this context asks, "if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst of Md.*, 434 F.3d at 269 (citation omitted). Factors bearing on this consideration include 1) advertising expenditures, 2)

11

sales success, 3) unsolicited media attention, and 4) the length and exclusivity of the mark's use. *Combe Inc. v. Dr. August Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 449 (E.D. Va. 2019).

Defendants argue that the CFA marks are commercially and conceptually weak for the same reason: "the overwhelming evidence of third-party uses and registrations of similar marks." Dkt. 94 at 36. Defendants argue that the dozens of other marks using some combination of the CFA letters demonstrate their commercial weakness and overall lack of distinctiveness. *Id.* at 37. Defendants also claim that the public, "[h]aving been trained to make distinctions based on single-letter differences, e.g., CFA v. CPA, CMA, CVA, CFP, CFS, CFF, CFE, CFC, CFH, CFM, CTFA, CRFA, CDFA, and many others, … can also 'easily distinguish' the differences in the parties' marks and designation names and has, in fact, done so for four years." *Id.* (emphasis theirs).

On the other hand, Plaintiff contends that the CFA Marks have been in use commercially for nearly 60 years, with roughly 170,000 "charterholders" active today. Dkt. 113 at 29. Plaintiff "has marketed the CFA Marks extensively, including in renowned and widely-read publications like The Wall Street Journal and The New York Times, with marketing expenditures totaling $51.5 million in 2017 alone." *Id.* Plaintiff represents that this has led to revenues today in excess of $330 million. *Id.* Plaintiff argues that courts have found marks to be commercially strong under similar circumstances. *Id.* (citing *MEGAComfort, Inc. v. Impacto Protective Prod., Inc.*, No. SACV 13-952-JLS-AJWx, 2013 WL 12119557, at *6 (C.D. Cal. Nov. 14, 2013)); *Combe*, 382 F. Supp. 3d at 451.

CFA's longstanding use of the CFA Marks in financial publications and in the financial services industry more broadly, adds heft to Plaintiff's position of the commercial strength of the CFA Marks. Although advertising in major publications should be distinguished from unsolicited

12

media attention, *Combe*, 382 F. Supp. 3d at 449, Plaintiff also offers evidence of substantial sales and marketing efforts establishing the marks' position in the market. On the other hand, Plaintiff cannot wholly dismiss the similarity of some third-party marks in related fields, nor can it deny the coexistence of a variety of acronyms like CFA and CPFA in the financial services sector.

Defendants point to significant third-party use of related marks but fail to identify any use of the CFA Marks themselves. Defendants also fail to address what appears to be the central inquiry bearing on a mark's commercial strength: actual marketplace activity concerning the mark.

Therefore, even though Plaintiff has not shown that the CFA Marks are so strong as to heighten the risk of confusion in the marketplace with any acronym remotely resembling the CFA credential, they present enough to have the more persuasive argument here. Plaintiff's establish that the CFA Marks have significant commercial strength.

### B. Actual Confusion

The Fourth Circuit on several occasions has characterized evidence of "actual confusion" in the marketplace as the "most important" of the nine factors bearing on likelihood of confusion. *George & Co.*, 575 F.3d at 398; *CareFirst of Md.*, 434 F.3d at 268. While "no actual confusion is required to prove a case of trademark infringement," *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 263 (4th Cir. 2007), such a consideration is nevertheless often "paramount to the likelihood-of-confusion analysis." *George & Co.*, 575 F.3d at 398. "Actual confusion can be demonstrated by both anecdotal and survey evidence." *Id.* Such anecdotal evidence can come in the form of "affidavits, declarations, and deposition testimony." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 937 (4th Cir. 1995).

Plaintiff fails to offer even a scintilla of evidence showing actual confusion in the marketplace. No survey, no anecdotal evidence, not even a single account from anyone who once

called CFA Institute seeking a CPFA credential, or vice-versa. Rather, Plaintiff's argument as to this prong amounts to: 1) Defendants' evidence as to the absence of confusion is unreliable, 2) Defendants haven't used the CPFA mark for very long or very extensively, and 3) absence of evidence showing actual confusion is non-dispositive. *See* Dkt. 113 at 43.

As to the first argument, Plaintiff requests the Court reject the survey's conducted by the Defendants due to unreliability. However, the Court does not need to consider the evidence put forth by the Defendants' experts. Aside from the surveys, Defendants cite a number of facts elicited through depositions and interrogatories which demonstrate that there is no specific evidence of confusion connected with CPFA and the CFA marks. *See* Dkt. 151 ¶¶ 69–75. For example, Defendants, citing to multiple depositions, note that they are not aware of any instances where: (1) individuals registered to obtain the CFA charter believing it to be the CPFA credential or vice versa; (2) people confusing CPFA with CFA Institute or the CFA charter; (3) website users being confused due to ARA's use of CPFA on ARA's website; (4) individuals communicated through the CFA website's contact center about ARA's use of the letters CPFA or about RISA issues; or (5) people asking the CFA Institute's customer service team about the CPFA credential. Plaintiff failed to offer any evidence to rebut Defendants and create a genuine issue of material fact on the likelihood of confusion. For this reason, the Court rejects Plaintiff's first contention.

Plaintiff's argument that the CPFA credential has not been active long enough for actual confusion to be demonstrated is also unpersuasive. True, the CPFA program did not experience a sizeable uptick of applicants until 2018, but the credential indisputably dates back to 2016. Dkt. 113 at 19, 44. As Defendants correctly note, even two years without any identifiable instance of actual confusion is a damning fact undermining the Plaintiff's claim. *See, e.g.*, *George & Co.*, 575 F.3d at 399–400 (finding that four instances of consumer confusion over two years was "at

14

best *de minimis*" and weighed against a likelihood of confusion; affirming grant of summary judgment in favor of defendant); *Worsham Sprinkler Co. v. Wes Worsham Fire Prot., LLC*, 419 F. Supp. 2d 861, 883–84 (E.D. Va. 2006) (a few instances of actual confusion within an eight-month period "must be considered de minimis"); *Yellowbrix, Inc. v. Yellowbrick Sols., Inc.*, 181 F. Supp. 2d 575, 581 (E.D.N.C. 2001) (denying plaintiff's motion for preliminary injunction, noting that no evidence of actual confusion during approximately one year of coexistence "supports a finding that [consumers] are unlikely to become confused in the future"); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (reversing jury verdict of trademark infringement where there were no documented instances of consumer confusion during 17 months of coexistence, calling the plaintiff's inability to point to a single incident of actual confusion "highly significant"); *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F. Supp. 318, 326 (S.D.N.Y. 1997) (awarding summary judgment in favor of defendant where the product had been on the market in the U.S. for almost two years, and on the market in France for two and a half years, "[s]ince those periods are both significant, and plaintiff has made no showing of actual confusion").

To be sure, a plaintiff may prove trademark infringement without offering evidence of actual confusion, *Vuitton Malletier S.A.*, 507 F.3d at 263, but the absence of any confusion makes Plaintiff's particular theory of trademark infringement difficult to accept at face value. To wit, Plaintiff asserts that laypeople will fail to distinguish between the CFA and CPFA Marks that appear on financial advisors' resumes, LinkedIn profiles, and company websites, resulting in lasting damage to the value of the CFA Marks, but this seems entirely speculative without a single example of someone confusing the credentials or thinking them merely interchangeable—much less a consumer survey showing a demonstrable portion of the market believes as much. In this manner, other courts within the Fourth Circuit have awarded defendants summary judgment based

15

chiefly on the plaintiff's inability to corroborate their assertions of infringement with any actual evidence from the marketplace. *E.g.*, *Mars, Inc. v. J.M. Smucker Co.*, No. 1:16-CV-01451, 2017 WL 4323582, at *2 (E.D. Va. Sept. 27, 2017); *Wag'N Enterprises, LLC v. United Animal Nations*, No. 1:11CV955 LMB/IDD, 2012 WL 1633410, at *1 (E.D. Va. May 9, 2012) (finding that plaintiff's failure to produce either evidence of actual confusion or a survey weighed heavily against a finding of infringement; awarding summary judgment in favor of defendant); *George & Co., LLC v. Imagination Entm't Ltd.*, No. 1:07CV498(LMB/TRJ), 2008 WL 2883771, at *3 (E.D. Va. July 25, 2008), *aff'd*, 575 F.3d 383 (4th Cir. 2009) (noting plaintiff's lack of survey evidence "severely hampers [its] ability to meet" the ultimate burden of proving a likelihood of confusion; granting summary judgment in favor if defendant). While the Court agrees with Plaintiff that its failure to offer evidence of actual confusion is non-dispositive, the absence of this significant factor further demonstrates there is no genuine dispute of material fact here.

### C. Other relevant *Perini* factors

Other relevant *Perini* factors that could go to show likelihood of confusion are completely absent here. For example, there is no evidence proffered to demonstrate bad faith or malintent here. When faced with whether a junior user – that is a user who has subordinate rights in a mark – the intent of the junior user is only relevant "if the junior user intended to capitalize on the good will associated with the senior user's mark." *CareFirst of Md.*, 434 F.3d at 273. But the best Plaintiff can show is that the ARA was aware of the CFA credential when they named the CPFA credential, and in fact they specifically considered the CFA credential along with a few others when deciding its name.

This falls far short of the intent relevant for this inquiry. "[K]nowledge of another's goods is not the same as an intent to mislead and to cause consumer confusion." *George & Co.*, 575 F.3d

16

at 398 (citation omitted). In fact, far from demonstrating an intent to mislead, deceive or cause consumer confusion, the evidence offered by Plaintiff as to ARA's prior knowledge of the CFA Marks demonstrates ARA's desire to avoid confusion between its new CPFA marks and marks that share letters with it.

Another *Perini* factor, the similarity of the advertising used by the markholders, underscores this point. In Defendants' advertising—at least what advertising is in the record—all references to "CPFA" appears as "NAPA CPFA." *E.g.*, Dkt. 93-15, 93-17–19, 93-52. Not only does this advertising corroborate Defendants' representations that it had no improper intent to confuse or mislead—Defendants' surveys relying on this very advertising tend to show that it was not likely to cause any confusion with the CFA Marks. More generally, the differences in the parties' advertising do more to corroborate Defendants' theory of the case: CFA provides a rigorous program for financial advisors generally, *see, e.g.*, Dkt. 113-21, while the CPFA credential caters to those advising employers on their fiduciary duties in crafting the retirement programs for their employees, *see, e.g.*, Dkt. 93–19.

Finally, regarding the sophistication of consuming parties, there can be no serious debate that those in the financial services industry are not likely to obtain the CPFA credential under the mistaken belief that it is affiliated with the CFA credential. Plaintiff argues that others—in effect secondary markets for these credentials—may be less sophisticated and more likely to confuse the two credentials. Namely, Plaintiff alleges that those who may hire people with CPFA credentials may mistakenly believe the credential to be associated with the CFA mark. But this assertion is both speculative and irrelevant. As stated above, Plaintiff offers no evidence that any layperson has ever in fact confused the two credentials since the CPFA program began. Second, this factor concerns "the sophistication of the usual purchaser," not those with whom the purchaser might

17

interact. *Perini*, 915 F.2d at 128. Construing this factor otherwise risks impermissibly broadening the relevant base of consumers.

In sum, no reasonable trier of fact could find in favor of Plaintiff on any of its four counts in this action, because Plaintiff fails to put forth evidence sufficient to create a genuine dispute of fact that Defendants' use of their CPFA credential creates a likelihood of confusion in the marketplace. Plaintiff fails to overcome opposing evidence regarding the sophistication of the consuming parties, the innocent intent of Defendants, and, most importantly, the absence of any evidence indicating actual confusion in the marketplace. Because the Court will award Defendants summary judgment based on their lack of liability, the Court need not address Defendants' arguments on Plaintiff's Accounting claim or Plaintiff's damages.

## IV.  Conclusion

For the foregoing reasons, the Court will award summary judgment to Defendants on Counts I – IV of Plaintiff's complaint. As Count V of Plaintiff's complaint bears only on Plaintiff's damages, it will be denied as moot to the extent it can be stated as a standalone cause of action. An accompanying order shall issue.

Entered this __5th__ day of November, 2020.

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE